225 N.J. Super. 196 (1988)
542 A.2d 16
ROGER MAURO AND LOIS MAURO, HIS WIFE, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
OWENS-CORNING FIBERGLAS CORP., PITTSBURGH CORNING CORP., EAGLE-PICHER INDUSTRIES, INC., AND KEENE CORP., DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted February 1, 1988.
Decided May 24, 1988.
*199 Before Judges J.H. COLEMAN, HAVEY and STERN.
Greitzer & Locks, for appellants/cross-respondents (Gene Locks, James J. Pettit, Karl N. McConnell and Michael B. Leh, on the briefs).
McCarter & English, for respondents/cross-appellants (Gita F. Rothschild, of counsel and on the briefs).
The opinion of the court was delivered by HAVEY, J.A.D.
Plaintiff Roger Mauro instituted this personal injury action against several manufacturers of asbestos-containing products plaintiff was exposed to during his employment as a plumber and a steam fitter from the late 1950's to the mid-1970's. Plaintiff was awarded $7,500 by a jury against defendants Owens-Corning Fiberglas Corporation, Pittsburgh Corning Corporation and Eagle-Picher Industries, Inc.[1] Plaintiff's principal argument on appeal is that the trial judge erred in dismissing his enhanced risk of cancer claim. On their cross-appeal, defendants' primary contention is that the trial judge erred in denying their motion at the close of plaintiff's case to dismiss plaintiff's claim for emotional distress, since plaintiff failed to prove substantial bodily injury or sickness resulting from the *200 distress. We reject the contentions raised on both the appeal and the cross-appeal and now affirm.
Plaintiff testified at trial he was exposed to asbestos while employed at Owens-Corning from 1957 to 1964 while performing various jobs involving the production of asbestos-containing pipe covering. In 1964, plaintiff was hired as a night repairman at Ancora State Hospital and was assigned to the plumbing-steam fitting shop where he installed plumbing, water and steam lines using asbestos covering. In 1981 he learned for the first time of the harmful effects caused by the ingestion of asbestos fibers. Tests performed on plaintiff by Dr. Peter Gann, Chief of Occupational Medicine at the New Jersey Department of Health, revealed bilateral pleural thickening of the chest walls and calcification of the diaphragm. Dr. Gann informed plaintiff by letter that "your exposure to asbestos has been significant and there is some evidence that this exposure may increase the risk of development of lung cancer."
Dr. James Guidice, a pulmonary specialist, testified on plaintiff's behalf that there was a "high probability" plaintiff had an increased risk of developing cancer as a result of exposure to asbestos. However, Dr. Guidice reached no conclusions regarding plaintiff's specific risk of developing cancer, and was unable to ascribe a specific percentage risk to plumbers or steam fitters as an occupational group who suffered exposure to asbestos. Dr. Guidice was also unable to quantify the "background risk" of those individuals not exposed to asbestos for developing cancer in order to compare the increased risk of those individuals who had been exposed. Moreover, Dr. Guidice could not say it was more probable than not that plaintiff would develop cancer as a result of the asbestos exposure.
Dr. Guidice also testified as to the progressive effect of asbestos on plaintiff's lungs and the need for medical surveillance. He approximated the annual costs of the tests to be between $300 and $500 for a complete breathing test, $50 to $75 for a chest x-ray and $35 per office visit. It was his view that *201 medical surveillance should continue for the duration of plaintiff's life. At the time of trial plaintiff was 47 years of age.
At the conclusion of plaintiff's case, the trial judge rejected plaintiff's enhanced risk claim. At the close of proofs, he charged the jury it could award plaintiff damages for his present medical condition, plaintiff's emotional distress and the cost of medical surveillance. No special verdict form was used and the jury returned a total award of $7,500 for all of plaintiff's claims.
Plaintiff first contends that the trial judge erred in rejecting his claim for enhanced risk of developing cancer caused by the asbestos. After appellant's brief was filed, the Supreme Court decided Ayers v. Jackson Tp., 106 N.J. 557, 598-599 (1987), in which the court declined to recognize a cause of action for the unquantified risk of disease suffered by plaintiffs as a result of exposure to carcinogens caused by the defendant township's contamination of plaintiffs' water supply. In his reply brief, plaintiff acknowledges Ayers' rejection of the enhanced risk claim, but argues that Ayers must be limited to actions against public entities within the framework of the Tort Claims Act, N.J.S.A. 59:1-1, et seq., relying on the following passage from Ayers:
In deciding between recognition or nonrecognition of plaintiffs' enhanced-risk claim, we feel constrained to choose the alternative that most closely reflects the legislative purpose in enacting the Tort Claims Act. We are conscious of the admonition that in construing the Act courts should "exercise restraint in the acceptance of novel causes of action against public entities." Comment, N.J.S.A. 59:2-1. In our view, the speculative nature of an unquantified enhanced risk claim, the difficulties inherent in adjudicating such claims, and the policies underlying the Tort Claims Act argue persuasively against the recognition of this cause of action. [Id. at 598].
There can be no doubt the Ayers court relied in part on the "admonition" that courts must act with restraint in creating new causes of action against public entities in the context of the Tort Claims Act. See id. at 621, n. 3 (Handler, J., concurring). However, the court's thorough analysis of the public policy considerations pertinent to tort litigation in general satisfies us *202 that its rejection of the unquantified enhanced risk claim was intended to apply to actions against private as well as public tortfeasors.
Ayers begins its analysis by postulating the basic issue:
Our evaluation of the enhanced risk and medical surveillance claims requires that we focus on a critical issue in the management of toxic tort litigation: at what stage in the evolution of a toxic injury should tort law intercede by requiring the responsible party to pay damages? [Id. at 579.]
Without reference to the Tort Claims Act, the court then defined the fundamental policy considerations dictating rejection of the unquantified risk claim. It first noted that such a claim "exposes the tort system, and the public it serves, to the task of litigating vast numbers of claims for compensation based on threats of injuries that may never occur." Id. at 597. In that regard, the court cited Anderson v. W.R. Grace & Co., 628 F. Supp. 1219, 1232 (D.Mass. 1986), which rejected the unquantified enhanced risk claim, first because it would create a flood of speculative suits and second, because:
... the increased risk of future harm in this action is the inevitable inequity which would result if recovery were allowed. `To award damages based on a mere mathematical probability would significantly undercompensate those who actually do develop cancer and would be a windfall to those who do not.' [Anderson, supra, 628 F. Supp. at 1232, citing Arnett v. Dow Chemical Corp., No. 729586, slip op. at 15 (Cal.Super.Ct. 1983)].
Ayers also underscores the burden on judges and juries of assessing damages for risk of potential disease "without clear guidelines," the self-evident increase in escalating insurance rates which would result, and the difficulty in managing and resolving the substantial litigation such a claim would generate. Ayers, supra, 106 N.J. at 597. Clearly, these policy considerations apply to litigation involving private as well as public tortfeasors.
Further, Ayers recognized that neither the statute of limitations nor the single controversy rule shall bar, toxic-tort claims instituted after a later discovery of a disease or injury caused by defendant's conduct, even if there has been prior litigation between the parties based on the same tortious conduct. Id. at 584. This approach is a fair and sensible accommodation to the *203 litigant whose unquantified risk claim is not presently cognizable, since it provides the litigant his or her day in court if and when the disease or injury is actually suffered. We do not read Ayers as intending to apply this accommodation only in toxic-tort cases involving public entity wrongdoers.
The speculative nature of plaintiff's enhanced risk claim here implicates the same policy considerations advanced by Ayers. Plaintiff's expert was unable to quantify plaintiff's enhanced risk, nor was he able to say within a degree of medical certainty that plaintiff will ever suffer from cancer as a result of the asbestos exposure. Further, as Dr. Guidice acknowledged, "thousands" of workers have been exposed to asbestos. Recognition of their unquantified enhanced risk claims raises the potential for a flood of speculative suits. Finally, neither the statute of limitations nor the entire controversy doctrine will bar plaintiff's future claim if he actually suffers cancer attributable to defendants' tortious conduct.
Plaintiff also argues that the Ayers' rejection of an unquantified enhanced risk claim is not controlling because in Ayers plaintiffs were not suffering from a present disease, whereas here, it is undisputed plaintiff suffers from a present disease: pleural thickening caused by defendants' asbestos. In Ayers, 300 plaintiff-residents ingested well water containing carcinogens. The source of the water contamination was a sanitary landfill owned and operated by the defendant Township of Jackson. While there was sufficient evidence for a jury to have found that plaintiffs suffered an increased risk of cancer, the Supreme Court rejected the unquantified claims because they were too speculative. Id. at 598-599.
We do not agree that the Ayers' rejection of the unquantified enhanced risk claim was predicated on the absence of a present injury or disease. The focus in Ayers was on the inability to quantify the claim and the undue burden on the tort system such a claim would impose if recognized. Rejection of the claim was also, at least impliedly, bottomed on the court's embracement *204 of the well-settled tort concept that damages are recoverable for prospective consequences of a tortious injury only if it is demonstrated that the apprehended consequences are reasonably probable. Id. at 592-593; see also Coll v. Sherry, 29 N.J. 166, 174-175 (1959). In each case cited by Ayers where the enhanced risk claim was recognized, recovery was conditioned upon a showing that the toxic exposure more probably than not will lead to cancer. See Hagerty v. L & L Marine Servs., Inc., 788 F.2d 315, 319 (5th Cir.), modified on other grounds, 797 F.2d 256 (5th Cir.1986); Jackson v. Johns-Manville Sales Corp., 781 F.2d 394, 412-413 (5th Cir.), cert. den. 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); Wilson v. Johns-Manville Sales Corp., 684 F.2d 111, 119 (D.C. Cir.1982). As we read Ayers, it is the speculative nature of the claim and "the difficulties inherent in adjudicating such claims" rather than the absence of a present disease or injury that formed the basis of the court's holding.[2]
Devlin v. Johns-Manville Corp., 202 N.J. Super. 556 (Law Div. 1985) is precisely on point. In Devlin, Judge Keefe rejected an unquantified enhanced risk claim despite the fact that plaintiffs presently suffered from an asbestos-related disease. Noting that "[t]here is no case ... which has allowed recovery for enhanced risk of future harm standing alone[,]" Judge Keefe rejected plaintiffs' enhanced risk claim because it was unquantifiable and plaintiffs could not meet the standard of proof required to recover for prospective injury: proof to a reasonable medical probability. Id. at 564-565. The judge found that asbestosis and asbestos-related cancer "are separate and distinct disease processes." Id. at 568. He then denied the enhanced risk claim, recognizing plaintiffs' "right to sue in the *205 future should the increased risk created by the exposure to asbestos come to fruition." Id. at 565.
While plaintiff here suffers from a present disease, his enhanced risk of cancer claim, as in Devlin, is based on a "separate and distinct disease process." Id. at 568. Because Dr. Guidice was unable to quantify plaintiff's enhanced risk of cancer and to predict, within a degree of reasonable probability, that plaintiff will develop cancer, plaintiff's enhanced risk claim is as speculative as plaintiffs' claim in Devlin. We therefore conclude that the claim was properly rejected by the trial judge.
Plaintiff next contends that the trial judge erred in precluding Dr. Guidice from testifying about statistical and epidemiological studies as to the increased risk of cancer. When Dr. Guidice was asked during an Evid.R. 8 hearing whether he was familiar with any statistical frequencies of cancer occurrence in "background" risk groups (those individuals not exposed to asbestos) in order to make a comparison to those individuals exposed to asbestos, he stated he did not have an "exact number," but that he had advised his patients in the past by formulating an opinion from "literature using statistics and ... epidemiological studies." He further explained that if asked about statistical frequencies for specific occupational groups, he was prepared to provide statistics regarding the increase in risk in those groups. However, he was unable to ascribe a specific percentage risk to plaintiff or to plumbers or steamfitters as an occupational group. The trial judge precluded Dr. Guidice from referring to the statistical data, because the data had not been furnished to defendants as part of Dr. Guidice's written report, or in other discovery furnished to defendants.
Plaintiff contends that even if enhanced risk is not a cognizable claim, the statistics were relevant as to his claims for fear of cancer and medical surveillance. He argues that the statistical data was admissible under Evid.R. 56(2), and since Evid.R. 57 permits an expert to testify in terms of opinion without prior disclosure of underlying facts or data, his failure to have presented the statistics as part of discovery should not have *206 been a basis for excluding the evidence. See McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 172 (App.Div.), certif. den. 108 N.J. 219 (1987); Amaru v. Stratton, 209 N.J. Super. 1, 11-12 (App.Div. 1985).
We agree with plaintiff that the statistical evidence was relevant as to the issues of fear of cancer and the need for medical surveillance. See Devlin, supra, 202 N.J. Super. at 570. We also agree Dr. Guidice had the requisite training and expertise to testify as to the statistical data, and that the data was "of a type reasonably relied upon by experts" in the field of pulmonary disorder. See Evid.R. 56(2). However, we are satisfied that the trial judge properly excluded reference to the statistics because they were not contained in Dr. Guidice's written report or any other discovery material. An expert's testimony at trial may be confined to the matters of opinion contained within the expert's report. McCalla, supra, 215 N.J. Super. at 171; Maurio v. Mereck Construction Co., Inc., 162 N.J. Super. 566, 569 (App.Div. 1978). While a trial judge has wide discretion in deciding the appropriate sanction for a breach of discovery rules, the sanction must be just and reasonable. Brown v. Mortimer, 100 N.J. Super. 395, 401 (App.Div. 1968).
Dr. Guidice's reports did not contain the statistics as to the enhanced risk in high risk groups as compared to the background risk groups. This was significant since the doctor intended to give generalized testimony as to increased risks of cancer relating to asbestos exposure by referring to the reports which he utilized in advising clients. Without defendants having available the exact data and statistics on which Dr. Guidice relied, they were deprived of the opportunity to examine the accuracy of this particularized data or to test Dr. Guidice's opinions which were bottomed on such data by way of deposition or otherwise. We are satisfied, as was the trial judge, that defendants were both surprised and prejudiced by Dr. Guidice's reference to these statistics during the Evid.R. 8 hearing. See Westphal v. Guarino, 163 N.J. Super. 139, 146 (App.Div.), aff'd 78 N.J. 308 (1978).
*207 We do not agree with plaintiff that reference to the statistics should have been allowed under Evid.R. 57. Evid.R. 57 is an evidence rule, not a rule of discovery, which gives a witness the right to render an opinion and to provide his reasons supporting the opinion without first being examined concerning the facts or data upon which the opinion is based. Current N.J. Court Rules of Evidence, Comment to Evid.R. 57. To read Evid.R. 57 as a per se rule allowing reference to underlying facts or data not previously disclosed, essentially nullifies the purpose of R. 4:10-2(d)(1), which requires disclosure through interrogatories of the "substance of the facts and opinions" to which the expert is expected to testify, as well as the expert's written report. Here, the trial judge was satisfied that the "particularized data" was sufficiently important to have been disclosed to defendants during discovery if Dr. Guidice intended to refer to it during his testimony. We find no abuse of discretion in the judge's exclusion of the evidence, particularly since Dr. Guidice was permitted to render his opinion as to enhanced risk as it was relevant to fear of cancer and medical surveillance without reference to the tables and statistics.
Plaintiff raises the following additional points on appeal:
POINT I  THE LOWER COURT ABUSED ITS DISCRETION BY REFUSING TO GRANT PLAINTIFFS' REQUEST FOR A MISTRIAL WHEN DEFENSE COUNSEL'S SUMMATION IMPROPERLY ASKED THE JURY TO DRAW AN ADVERSE INFERENCE FROM THE ABSENCE OF DR. SPIRN, AND WHERE THE COURT'S CURATIVE INSTRUCTION WAS MANIFESTLY INADEQUATE TO CURE THE HARM.
POINT II  THE LOWER COURT ABUSED ITS DISCRETION WHEN IT PRECLUDED PLAINTIFFS' PUNITIVE DAMAGE WITNESSES FOR VIOLATION OF RULE 4:17-7.
POINT III  DEFENSE COUNSEL ERRED IN ARGUING TO THE JURY BEYOND THE RECORD AND IN SUGGESTING THAT PLAINTIFFS DID NOT BELIEVE THE TRIAL WAS IMPORTANT.
We have carefully considered plaintiff's remaining contentions and supporting arguments and are satisfied that they are clearly without merit. R. 2:11-3(e)(1)(E). As to plaintiff's claim that the trial judge erred in precluding plaintiff from amending the interrogatories to add "punitive damage witnesses," *208 we add only that the amendment was made 18 days prior to the first scheduled trial date in violation of R. 4:17-7. Moreover, the amendment sought to list additional expert witnesses who were never named in prior discovery. We agree with defendants that to have allowed the amendment at such a late date would have changed the complexion of the case and prejudiced defendants beyond any ability to cure. See Brown, supra, 100 N.J. Super. at 402.
On their cross-appeal, defendants contend that the trial judge erred in instructing the jury that plaintiff may recover for fear of developing cancer absent evidence of substantial bodily injury or sickness resulting from the fear. Plaintiff testified that after receiving Dr. Ganns' letter informing plaintiff that he had bilateral pleural thickening and was exposed to an increased risk of cancer, he was "very angry, very upset ... very scared." Noting that he had experienced his mother and a previous employer die from cancer, as well as a co-worker die from lung cancer, plaintiff explained: "I'm still very scared today. I don't want to die from lung cancer. I'm a young man." Mrs. Mauro testified that plaintiff became nervous before his medical examinations and that she and plaintiff were trying "to do things a little sooner" in life as a result of plaintiff's illness.
The trial judge charged the jury that in order for plaintiff to recover for emotional distress related to his enhanced risk of cancer, the jury must find plaintiff was currently suffering from serious fear or emotional distress, his fear was proximately caused by his exposure to asbestos, and the fear was reasonable.
In arguing that plaintiff must demonstrate a present physical manifestation of the emotional distress, defendants rely on the trial court opinion in Ayers, 189 N.J. Super. 561, 570 (Law Div. 1983), modified 202 N.J. Super. 106 (App.Div. 1985), aff'd in part, rev'd in part 106 N.J. 557 (1987), and Falzone v. Busch, 45 N.J. 559, 569 (1965), which held that emotional distress must be manifested by substantial bodily injury or sickness before there *209 can be recovery. The emotional distress verdicts in Ayers were reversed on the narrow basis that plaintiffs' claims of depression, stress and anxiety constituted "pain and suffering," recovery for which is expressly barred by the Tort Claims Act, N.J.S.A. 59:9-2d. Ayers, supra, 106 N.J. at 577. Thus, the Supreme Court did not address whether proof of physical symptoms or injuries relating to the distress was a prerequisite to recovery, except to note in dictum that our cases no longer require proof of causally-related physical impact to sustain a recovery for emotional distress. Id. at 574.
We are satisfied that plaintiff's claim for "serious fear or emotional distress" is cognizable on the facts before us. In Falzone, our Supreme Court abandoned the concept that physical impact was a predicate to a recovery for fright or emotional distress. Falzone, supra, 45 N.J. at 569. However, in such cases, plaintiff must demonstrate that the fright or distress resulted in "substantial bodily injury or sickness." Ibid; see also W.P. Keeton, D. Dobbs, R. Keeton, & D. Owens, Prosser & Keeton on Torts, § 54 at 361 (5th ed. 1984) ("Where the defendant's negligence causes only mental disturbance, without accompanying physical injury, illness or other physical consequences ... the great majority of courts still hold that in the ordinary case there can be no recovery."). As recently stated by our Supreme Court in Strachan v. John F. Kennedy Memorial Hosp., 109 N.J. 523 (1988):
The requirement of physical injury is grounded on the notion that emotional distress claims are too easily fabricated without such a limitation. Prosser, supra, § 54 at 361. Finding that rationale insufficient to withhold recovery for distress claims that might prove legitimate, an increasing number of courts have abandoned the physical-injury limitation altogether. [Id. at 537; citations omitted].
Proof that emotional distress has resulted in "substantial bodily injury or sickness" is not required when plaintiff suffers from a present physical disease attributable to defendant's tortious conduct. In Evers, supra, 95 N.J. at 406, the Supreme Court recognized a claim for emotional harm based on a fear of cancer in a malpractice setting. Plaintiff was prepared to show *210 that "she suffered anxiety, emotional anguish and mental distress" resulting in part "from the realization, following the confirmation of her malignancy, that defendant's delay in her treatment had increased the risk that she would again fall victim, perhaps fatally, to the disease." Ibid. Noting that "courts have come to recognize that mental and emotional distress is just as `real' as physical pain, and that its valuation is no more difficult[,]" the Evers court held that on retrial plaintiff should be permitted to present her emotional distress claim, and did not make the claim dependent upon proof of substantial bodily injury or sickness resulting from the emotional trauma. Id. at 410. Of significance in Evers is that the distress claim was based on a present disease attributable to defendant's misdiagnosis.
Devlin, 202 N.J. Super. 556, recognized that where plaintiffs suffered from present manifestations of asbestos-related disease, they may recover for "serious fear or emotional distress or a clinically diagnosed phobia of cancer" if the fear is reasonable and proximately caused by exposure to the asbestos. 202 N.J. Super. 563. Devlin distinguished Ayers by noting that none of the Ayers plaintiffs were presently suffering from physical illness as a result of their ingestion of pollutants, whereas the emotional injury of the Devlin plaintiffs stemmed from the substantial bodily harm they had already suffered as a result of ingesting asbestos over an extended period of time. 202 N.J. Super. at 562-563. Herber v. Johns-Manville Corp., 785 F.2d 79 (3d Cir.1986), is in accord with Devlin. Applying New Jersey law, the third circuit held that a plaintiff, exposed to asbestos and presently suffering from pleural thickening, could recover for emotional distress without evidence that the distress caused injury or sickness. Id. at 85. The court noted:
Because the jury in this case found that exposure to the defendants' asbestos had caused pleural thickening, we are confident that the Supreme Court of New Jersey would treat Mr. Herber's emotional distress claim no differently than a pain and suffering claim in a slip and fall case. [Ibid.]
Here, plaintiff presently suffers from pleural thickening as a result of long-term exposure to defendants' asbestos. *211 Sufficient evidence was presented to permit the jury to find plaintiff suffered from serious emotional distress and that the distress was reasonable. Although plaintiff offered no evidence of physical manifestation of the fear or distress, such proof was not necessary in the circumstances here. We are satisfied that the trial judge did not err in presenting the emotional distress claim to the jury.
Defendants also argue the trial judge erred in failing to instruct the jury that any damages for medical surveillance must be reduced to present value. Because defendants did not request the jury charge, we must decide whether the judge's failure to give the charge constitutes plain error. R. 2:10-2.
A medical surveillance claim is for recovery of the cost of periodic medical examinations intended to monitor a plaintiff's health and facilitate early treatment necessitated by the enhanced risk of cancer caused by defendant's tortious conduct. See Ayers, supra, 106 N.J. at 599. As such, it is clearly a claim for pecuniary loss. Because such a claim for future medical expenditures can be calculated objectively and without difficulty, discounting the future loss to present value is not only just, but feasible. See Friedman v. C & S Car Service, 108 N.J. 72, 78 (1987); Tenore v. Nu Car Carriers, 67 N.J. 466, 477 (1975). Thus, the trial judge's failure here to apply the present value rule as to the medical surveillance claim was error.
However, we are not persuaded that the error was clearly capable of producing an unjust result. The jury awarded a total of $7,500 for plaintiff's claims of bodily injury, emotional distress, pain and suffering and medical surveillance. Plaintiff was 47 years of age at the time of trial. Dr. Guidice projected the medical surveillance costs, which he found necessary because of the presence of asbestos fibers in plaintiff's body, as being between $385 to $610 annually. We, of course, do not know if the jury awarded any amount for medical surveillance, since the modest $7,500 verdict encompassed all of plaintiff's *212 damage claims.[3] If the jury did award for medical surveillance, the amount was clearly nominal. Thus, we cannot conceive that the award for medical surveillance, if any, would have been any less if the present value instruction had been given. In view of the jury verdict, we find no reversible error in the trial judge's failure to give the present value charge.
Defendants raises the following additional contentions on their cross-appeal:
POINT I  PLAINTIFF IS NOT ENTITLED TO RECOVER MEDICAL SURVEILLANCE EXPENSES AS A MATTER OF PUBLIC POLICY.
POINT II  THE COURT ERRONEOUSLY EXCLUDED BUSINESS RECORDS OFFERED IN EVIDENCE BY DEFENDANTS.
We have carefully considered defendants' remaining contentions on their cross-appeal and find them to be clearly without merit. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] The jury returned a no cause verdict on plaintiff Lois Mauro's per quod claim. This finding is not challenged on appeal.
[2] In Evers v. Dollinger, 95 N.J. 399, 412, n. 7 (1984), the Supreme Court had the opportunity to recognize "increased risk" as an actionable element of damage for a misdiagnosis of breast cancer in a malpractice setting. The court was not required to decide this "provocative question" because plaintiff had in fact suffered a recurrence of the disease prior to the Supreme Court's decision.
[3] In toxic-tort personal injury cases, where there are raised unique and difficult damage issues such as enhanced risk, emotional distress and medical surveillance, the trial judge should employ the special verdict rule, R. 4:39-1, and have the jury make specific findings as to each cause of action. Such a procedure permits "isolation of any error, ... avoidance of full-blown appeals and full-scale retrials...." Nylander v. Rogers, 41 N.J. 236, 240 (1963); Jackson v. Consolidated Rail Corp., 223 N.J. Super. 467, 484, n. 4 (App.Div. 1988).